15 F.3d 1084
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Hiawatha CORNISH, Plaintiff-Appellant,
v.
CITY OF LOS ANGELES, DEPARTMENT OF WATER AND POWER,
Defendant-Appellee.
 No. 92-55645.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 6, 1993.
Decided Feb. 2, 1994.
 
 1
 Before: FLETCHER and D.W. NELSON, Circuit Judges, and WILL,* District Judge
 
 
 2
 MEMORANDUM**
 
 
 3
 Hiawatha Cornish, an African-American employed by the City of Los Angeles Department of Water & Power, appeals the district court's denial of his claims of racial discrimination. Cornish brought a disparate treatment claim and an adverse impact claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000(e). We have jurisdiction and we affirm.
 
 FACTS AND PRIOR PROCEEDINGS
 
 4
 Hiawatha Cornish is a 61-year-old African-American man. He was employed at the City of Los Angeles Department of Water & Power ("DWP") for over 39 years. At the time of the events in question, Cornish had been a Mechanical Engineering ("ME") Associate[1] in the Mechanical Engineering Section, Power, Design and Construction ("PD & C") Division since 1969. He had been assigned to the Instruments and Control Group ("I & C") since he had been an Associate ME.[2]
 
 
 5
 Prior to 1984, Cornish received a 3 pay grade ("PG") raise from his Associate salary of PG42 to a Super Associate salary of PG45. The Super Associate of each group earns an extra 3 PGs for supervisorial responsibilities in the absence of the supervising engineer.[3]
 
 
 6
 In 1981, Cornish successfully competed in the Civil Service examination process for eligibility for promotion to the classification of ME, and was certified on the "Eligible List" for promotion to an open and available ME position. In 1984, the ME position in the I & C group became available. As of June 1984, the ME Section, which contains the I & C group, had at least three vacancies for MEs in different groups, including I & C.
 
 
 7
 What happened next is contested. The district court found, and DWP contends on appeal, that DWP filled the position for ME in I & C in accordance with Policy Sec. 15-4, entitled "Preference in Filling Positions." This policy provides that "[i]n filling a position, consideration shall first be given to employees already working in the class ... before going to an Eligible List." (Excerpt of Record at 88).
 
 
 8
 According to DWP, William Burbridge was reassigned to the ME position in I & C in accordance with Policy Sec. 15-4. Burbridge was an Administrative Systems Engineer ("ASE") in the PD & C head office in 1982. He was promised a promotion to Senior Power Engineer, which never came. However, from 1982 to 1984 he functionally served as both ASE and as Senior Power Engineer. Some time in 1984, Burbridge contacted the Assistant Division Head, Pat Wong, to whom he reported, to seek reassignment. Wong contacted Art Buchanan, manager of the ME Section, to see if any positions were available in the ME Section. Buchanan requested a resume from Burbridge, which he received and forwarded to his assistant Friesen. Based on his knowledge of Burbridge's work and on the positive report from Friesen, Buchanan decided to reassign Burbridge to the ME Section. Buchanan offered Burbridge his choice of any vacant supervisory position in the ME Section, and Burbridge selected the I & C group. According to DWP, although Burbridge did not have significant design or supervisory experience in Instruments & Control work, he did have significant operational experience in this area and thus was qualified for the ME position in I & C. Burbridge was reassigned from a higher pay level (PG54) to a lower pay level (PG52). Burbridge's reassignment to ME in the I & C was in the same class as his previous position, and thus in accordance with Policy Sec. 15-4. The position was filled before any "reachable" candidates were considered.[4] Therefore, all Associate MEs, including Cornish, were foreclosed from competing for the ME position in I & C.
 
 
 9
 DWP management subsequently requested the Personnel Department to "certify" candidates from the Eligible List for ME vacancies in the other two groups. Cornish was certified and was interviewed by a panel of two Caucasian Senior Power Engineers for two of the positions. When the process was completed, a Caucasian, Alan Walti, and an African-American, Wallace Russell, were selected for promotion.
 
 
 10
 Cornish presents a different version of the facts. He contends that in 1984 the ME position in I & C was put out to bid, and that he competed for this position by virtue of his listing on the Eligible List. Burbridge, a Caucasian who, unlike Cornish, had no design experience, was laterally transferred to the ME position. This lateral transfer contravened prior departmental practice, which had been to appoint the assistant group leader to an open position if he was listed as eligible.
 
 
 11
 Cornish filed a charge of discrimination with the Equal Employment Opportunity Commission in August 1986. He subsequently received a Right to Sue Letter from the Department of Justice and litigated this case in district court. After a three day bench trial, the district court entered judgment for DWP on February 20, 1992. The district court vacated and reentered judgment on May 14, 1992 and Cornish timely appealed the latter judgment.
 
 
 12
 The district court had jurisdiction over this case pursuant to 42 U.S.C. Sec. 2000(e). We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 STANDARD OF REVIEW
 
 13
 The district court's findings of fact in a Title VII case are reviewed for clear error. Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985); Yee v. Department Envtl. Serv., 826 F.2d 877, 880 (9th Cir.1987). Findings as to discriminatory intent are findings of fact subject to review for clear error. Pullman-Standard v. Swint, 456 U.S. 273, 288-90 (1982); Edwards v. Occidental Chem. Corp., 892 F.2d 1442, 1447 (9th Cir.1990). Whether an employer's justification for differential treatment is pretextual is reviewed for clear error. Saint Mary's Honor Ctr. v. Hicks, --- U.S. ----, 113 S.Ct. 2742, 2756 (1993); Edwards, 892 F.2d at 1449.
 
 DISCUSSION
 I. Disparate Treatment Claim
 
 14
 Cornish's first claim is one of disparate treatment based on race. In order to establish such a claim, the plaintiff must prove that the defendant's acts were "intentionally discriminatory." McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). Disparate treatment can be established by circumstantial evidence adequate to create an inference that an employment decision was based on impermissible criteria. Jauregui v. City of Glendale, 852 F.2d 1128, 1134 (9th Cir.1988).
 
 
 15
 In Burdine, the Supreme Court described the appropriate order and burden of proof in disparate treatment cases. 450 U.S. at 252-53. First, the plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff is successful, the burden shifts to the defendant to articulate a "legitimate nondiscriminatory reason" for the decision adverse to the employee. Once the defendant meets this burden, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant are merely a pretext for discrimination. Although the burden of production shifts between the parties, the burden of proof by a preponderance always is the plaintiff's. Id.
 
 
 16
 A. Whether the Plaintiff Established a Prima Facie Case is Not Relevant on Appeal
 
 
 17
 The district court found, and DWP argues, that Cornish failed to establish a prima facie case of disparate treatment.[5] Cornish correctly argues that once a case proceeds to judgment, the issue of whether a prima facie case was made is no longer relevant. In United States Postal Serv. Bd. of Govs. v. Aikens, the Supreme Court stated that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is irrelevant." 460 U.S. 711, 715 (1983) (remanding case to the district court because its erroneous focus on the question of prima facie case and not on the question of discrimination might have influenced its findings of fact); see also Bouman v. Block, 940 F.2d 1211, 1223 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 640 (1991) (on appeal, court does not consider challenge that plaintiff failed to establish prima facie case, but instead looks at whether there was discrimination); Parker v. Mississippi State Dep't of Pub. Welfare, 811 F.2d 925, 929 (8th Cir.1987) (appellate court should not consider whether defendant articulated a legitimate nondiscriminatory reason for its actions but instead should review trial court's findings as to the ultimate issue of discrimination).
 
 
 18
 In this case, after Cornish presented his evidence the DWP moved for summary judgment. At this point the district court declined to grant the summary judgment.[6] Because the district court did permit the entire bench trial to proceed, under Aikens, we must focus not on whether Cornish established a prima facie case, but instead on whether the district court correctly found that DWP did not intentionally discriminate against Cornish.
 
 B. Evidence of Pretext
 
 19
 After hearing all of the evidence, the district court found that the non-discriminatory reason offered by DWP for the promotion decision was not pretextual. The district court adopted DWP's explanation of the facts: Cornish never competed for the ME position in I & C because the position was filled by laterally reassigning Burbridge in accordance with Policy Sec. 15-4, which provides that in filling vacancies, management must first look to individuals who have requested reassignment before considering those on the Eligible List. We must affirm the district court unless its finding is clearly erroneous. Fed.R.Civ.P. 52(a); Anderson, 470 U.S. at 574.
 
 
 20
 Cornish argues that several types of evidence demonstrate that this explanation is pretextual.
 
 1. Failure to comply with internal policies
 
 21
 Cornish first argues that DWP failed to comply with internal policies and procedures because Burbridge failed to submit a "Desire for Transfer and Reassignment Form" or an "Interview Data Sheet," as required by General Manager's Bulletin No. 81-25. DWP argues that such a request for transfer form was not required under Policy Sec. 15-4.
 
 
 22
 Although it may be true that the time-relevant version of Policy Sec. 15-4 does not require that individuals seeking lateral transfers submit transfer request forms, both Bulletin No. 81-25 (dated Nov. 18, 1981) and Industrial Relations Bulletin No. 83-11 (dated April 1, 1983) provide that employees seeking reassignment should submit these forms to the Personnel Department, and that the appointing manager consult with Personnel when he or she intends to fill a position. (Excerpt of Record at 21-22).
 
 
 23
 Although the completion of transfer request forms appears to have been proper procedure, the evidence with respect to how regularly these procedures were followed is mixed. Jon Reuschel, DWP's Employee Relations Manager, testified that it was DWP policy to request reassignment forms during the period in question. However, Reuschel also testified that the purpose of the registration form and the interview data sheet was to notify a manager with a vacancy of interested applicants, and that that is the only manner in which a manager would know of interested applicants unless he was told. He further stated that when a vacancy occurred, a manager could first consider other employees of the same class within that section and shuffle them around prior to consulting registration forms.
 
 
 24
 In this case, Burbridge was employed in the same section (but a different division) as Cornish; Reuschel's testimony suggests that although written policy required individuals seeking reassignment to complete forms, on infrequent occasions individuals may have been reassigned without following such a procedure.
 
 
 25
 Cornish's second contention is that DWP violated internal policy because Burbridge's reassignment from a PG54 position, which is not an entry level position, to PG52, which is an entry level position, was not "within" entry levels as required by administrative policy. Bulletin No. 83-11 provides that employees who meet certain requirements are eligible for reassignment "to other entry level positions in their class." (Excerpt of Record at 21). While DWP argues that the word "to" implies that reassignments need not be "within" entry level positions, the use of the word "other" implies that the individual must be reassigned from an entry level position. On the other hand, Bulletin No. 81-25 suggests that transfers need only be to, and not from, an entry level position. (See Excerpt of Record at 22 (stating that employees who wish "to be considered for a reassignment or transfer within class to an entry level position should submit" the relevant forms)).[7]
 
 
 26
 Burbridge was assigned within a class and to an entry level position, but not from an entry level position. While the text of Bulletin No. 83-11 supports Cornish's claim that Burbridge's reassignment was improper because it was not from an entry level position, the text of Bulletin No. 81-25 suggests that transfers needed only be to, and not from, such a position.
 
 2. Burbridge's lack of design experience
 
 27
 Cornish also argues that DWP's action was discriminatory because Burbridge, who had no real experience in design and thus was less qualified for the position than Cornish, was hired for the ME position. DWP recognizes that Burbridge did not have significant design experience in Instruments & Control work. However, DWP argues that Burbridge was a qualified engineer with significant operational experience in Instruments & Control work, and that Burbridge lacked only supervisory and not technical experience. DWP argues that Burbridge was therefore qualified for the ME position in the I & C design group.
 
 
 28
 We are troubled by the potential subjectivity of a system in which individuals without immediate experience may transfer laterally to new positions before eligible candidates with arguably more direct experience are promoted. Such a policy could be used to laterally transfer less qualified Caucasian employees to positions they prefer, but to deny lateral transfers to African-American employees on the grounds that they lack the proper experience. However, we are also aware that a lateral transfer policy may help minorities by permitting them to broaden their experience and thus to increase the likelihood of receiving a promotion by transferring into a position for which they lack direct experience but which they are qualified to perform. In this case, Cornish does not present evidence that Burbridge was unqualified for the ME position in the design group, only that he had no experience in the design group. Furthermore, there is no evidence in the record that African-Americans or other minorities have requested lateral transfers and been denied on the grounds that they were unqualified for the transferee position.
 
 3. Comparative and Statistical Evidence
 
 29
 Cornish also attacks DWP's explanation as pretextual by presenting evidence to suggest that Caucasians in a comparable situation were treated more favorably. See McDonnell Douglas, 411 U.S. at 804 (especially relevant to a showing of pretext is evidence that white employees involved in similar acts were treated differently); Fong v. American Airlines, 626 F.2d 759, 762 (9th Cir.1980) (plaintiff attempted to provide evidence that he was treated differently from similarly situated Caucasian employees). Specifically, within the five-year period preceding the events at issue, the three times reachable assistant group leaders were promoted within their group to ME positions, the promoted individuals were Caucasian. Cornish thus implicitly argues that it is only when a minority Associate seeks to fill a vacancy within his group that DWP resorts to discriminatory lateral transfers.
 
 
 30
 Cornish's evidence is accurate, but it is insufficient to establish a case of discrimination. During the five-year period in question, there were a total of nine promotions to ME in the ME Section. On three of these occasions, the reachable Caucasian within the group was promoted. In one case, a Filipino male was promoted from outside the ME section to a design group where the Caucasian assistant group leader was eligible for promotion. In another case, an Asian-American was promoted to head a group in which he had no direct experience although the Hispanic group leader was reachable.[8] Presumably in the other four cases there were no reachable, in-group assistant group leaders. None of this is conclusive. We recognize that African-Americans could be discriminated against while other groups were not, but the point to be made is that the evidence is insufficient to establish that the explanation is pretextual.
 
 
 31
 Cornish provides several types of statistical evidence. Generally speaking, plaintiffs in a disparate treatment case may use statistical evidence to show that a defendant's articulated explanations are pretextual. Diaz, 752 F.2d at 1362; Lowe v. Monrovia, 775 F.2d 998, 1008 (9th Cir.1985), amended, 784 F.2d 1407 (1986). Such evidence may be helpful by reflecting a discriminatory pattern or practice in hiring or promotion. McDonnell, 411 U.S. at 805 n. 19; Diaz, 752 F.2d at 1363. However, statistical evidence is not in and of itself dispositive as to whether an individual hiring decision was discriminatory. McDonnell, 411 U.S. at 805 n. 19 ("general determinations, while helpful, may not be in and of themselves controlling as to an individualized hiring decision").
 
 
 32
 The record contains several types of statistical evidence. First, it contains a 1986 report by the City's Personnel Department. The report indicates that from 1982 to 1985 the number of African-Americans qualified and available to fill ME positions was between zero and five (between 0% and 15.8% of the total pool of qualified candidates). During these years African-Americans were appointed to ME positions in proportion to their availability. Cornish also refers to DWP's workforce statistics for 1981-1991, which provide a racial breakdown of the workforce according to broad job category. These statistics demonstrate that African-Americans are significantly underrepresented in senior level jobs (i.e., officials and administrators; professionals; technicians) relative to their overall representation in the workforce.[9] There were no African-American MEs at DWP prior to 1983.
 
 4. Summary of Evidence
 
 33
 Given the record as a whole, we cannot find that the district court was clearly erroneous in concluding that Cornish failed to prove disparate treatment by a preponderance of the evidence. DWP points to a written policy, which provides that when a specific job position becomes available, management must consider transferring qualified employees who have requested a lateral transfer before they consider promoting employees who have been certified and are listed on the Eligible List. The existence of this policy provides a reasonable explanation of the events in question. It is true that management did not follow proper procedure in reassigning Burbridge when it did not require him to complete the relevant transfer request forms. But a failure to follow procedures in itself does not deny the existence of the lateral transfer policy. The fact that Burbridge did not complete the proper forms but instead relied on word of mouth to advertise his desire for a lateral transfer does not show that Policy Sec. 15-4 was implemented in a discriminatory manner in this case.
 
 
 34
 More troubling is Bulletin No. 83-11, which implies that an individual may transfer laterally only from one entry level position to another. However, it is also possible to read Bulletin No. 83-11 as only requiring transfers to entry level positions, and Bulletin No. 81-25 clearly suggests that lateral transfers are permitted from non-entry level positions into entry level positions. Given the ambiguous language in the various policies in effect during the time in question, we cannot conclude that Policy Sec. 15-4 only permitted transfers from or within entry level positions; it is reasonable to read these policies as authorizing lateral transfers from any in-class position to an entry level position.
 
 
 35
 The comparative and statistical evidence offered by Cornish is also mixed. The statistics show that African-Americans are significantly underrepresented in senior positions at DWP. These numbers raise disturbing questions with respect to DWP's historical treatment and promotion of African-Americans. However, such evidence of a racially unbalanced workforce cannot in and of itself be conclusive proof of discriminatory intent in a specific disparate treatment case. Moreover, the statistics most relevant to this case, which show that African-Americans are promoted in proportion to their availability, do not support Cornish's claim.
 
 C. The Secondary Interview Process
 
 36
 After Burbridge was reassigned to I & C, Cornish, along with ten other individuals on the Eligible List, competed for the vacant ME positions in the Scheduling and Fire Protection groups by going through a secondary interview process. Cornish argues that this process was discriminatory for two reasons: the secondary interview examination was "unauthorized" and the use of an all white interview panel is inherently suspect.
 
 
 37
 We are extremely disturbed by the use of an all-white interview panel. Promotional systems that use subjective evaluations by all-white supervisors provide a ready mechanism for discrimination. EEOC v. American Nat'l Bank, 652 F.2d 1176, 1199-2000 (4th Cir.1981), cert. denied, 459 U.S. 923 (1982) (some probative force to the fact that in racially-unbalanced situation the individuals with the job of evaluating applicants for the six year period in question are all white); Fisher v. Proctor & Gamble Mfg., 613 F.2d 527, 545 (5th Cir.1980), cert. denied, 449 U.S. 1115 (1981). DWP argues that the interview panels are typically composed of Senior Power Engineers in the groups with vacancies and that in this case there were no minority Senior Power Engineers in the two groups with vacancies. This does not excuse the use of all-white selection panels. Until the time that DWP has minority Senior Power Engineers to serve on its selection panels, it should seek experienced minority raters from outside of the organization (i.e. from other cities' agencies or from county agencies) to diversify its selection panels.
 
 
 38
 Although we are troubled by the use of the all-white interview panel, we cannot review this issue on appeal because it was not raised below. E.g., Davis v. Mason County, 927 F.2d 1473, 1479 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 275 (1991). At trial, Cornish testified regarding the secondary interview panel but when DWP attempted to question a member of the interview panel, Cornish objected to that line of questioning, stating that he did not take issue with the selection process related to these ME positions and that his only concern was with the ME position in I & C. Moreover, Cornish did not object when the district judge stated that his understanding was that Cornish did not present any claims of pretext associated with the secondary interview process. Because Cornish actually objected at trial to the issue being raised, we cannot review this issue on appeal.
 
 
 39
 Even if we were to consider the all-white interview panel on appeal, the facts presented do not support Cornish's claim that the all-white interview panel in this case acted with discriminatory intent. Of the eleven employees who interviewed for ME positions before this panel, two were African-American (including Cornish) and five were Caucasian; from this group, one African-American and one Caucasian were promoted.
 
 II. Adverse Impact Claim
 
 40
 Cornish also raises a claim of adverse impact due to excessively subjective employment practices. An adverse impact claim challenges " 'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.' " Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1480 (9th Cir.1987) (quoting International Bd. of Teamsters v. United States, 431 U.S. 324, 336 n. 15 (1977)). A plaintiff need not prove discriminatory intent in an adverse impact case because the court is concerned with "the consequences of employment practices, not simply the motivation." Id. (quoting Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971)). The plaintiff must instead prove discriminatory impact. Rose v. Wells Fargo & Co., 902 F.2d 1417, 1421 (9th Cir.1990). Therefore, the court typically focuses on statistical disparities and on the competing explanations for those disparities. See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987 (1988).
 
 
 41
 To establish a prima facie case of adverse impact, the plaintiff must: "(1) identify the specific employment practice challenged; (2) show disparate impact; and (3) prove causation." Rose, 902 F.2d at 1424. Once the plaintiff establishes a prima facie case of adverse impact, the defendant must then either discredit the plaintiff's statistical evidence, provide statistics that demonstrate that no disparity exists, or show that its employment practices are based on legitimate business reasons such as business necessity. Id.
 
 
 42
 In Wards Cove Packing Co. v. Atonio, the Supreme Court discussed the appropriate type of statistical showing in an adverse impact case. The Court stated that the evidence should properly compare " 'the racial composition of [the at-issue job] and the racial composition of the qualified ... population in the relevant labor market.' " 490 U.S. 642, 650 (1989) (citing Hazelwood School Dist. v. United States, 433 U.S. 299, 307-08 (1977)). "[A] Title VII plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line,' there is a racial imbalance in the workforce"; the plaintiff must show that a particular practice, in this case the subjective lateral transfer process, caused an adverse impact. Wards Cove, 490 U.S. at 657. In other words, Cornish must offer "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Rose, 902 F.2d at 1424.
 
 
 43
 Although Cornish does identify the lateral transfer process of Policy Sec. 15-4 as the employment practice he wants to challenge, Cornish has failed to demonstrate disparate impact. Our circuit requires the statistical disparity in an adverse impact case to be "substantial" or "significant." Bouman, 940 F.2d at 1225; Clady v. County of Los Angeles, 770 F.2d 1421, 1428 (9th Cir.), cert. denied, 475 U.S. 1109 (1986) (noting that our circuit does not follow a strict rule regarding what showing is sufficient). The only statistics comparing the racial composition of those individuals in the at-issue job (i.e. MEs) with the racial composition of the qualified labor pool (i.e. individuals qualified to become MEs) are in the 1986 report by the City's Personnel Department. The report provides that from 1982 to 1985 African-Americans comprised zero to 6.25% of the individuals in the ME class and 3.03% to 5.88% of the Associate MEs. The statistics also show that African-Americans available for ME positions were appointed in proportion to their availability. While African-Americans are underrepresented in both Associate ME and ME positions, there is no disparity between the pool of candidates available for ME positions and the pool of employees who are MEs.[10]
 
 
 44
 Cornish also fails to establish causation between Policy Sec. 15-4 and the small number of African-Americans promoted to ME positions. The record indicates that this was the first use of a lateral transfer to fill a vacant ME design position in five years. Cornish argues that lateral transfers were not used when Caucasians were reachable for in-group promotion and that the process was only used when an African-American was reachable for in-group promotion. While this may be true, it is not clear how the one-time use of a lateral transfer establishes a pattern of discrimination. There is, for example, no evidence that lateral transfers were sought and denied in those cases where Caucasians were reachable for in-group promotions.
 
 CONCLUSION
 
 45
 The evidence presented by Cornish raises disturbing questions with respect to DWP's treatment of African-Americans. The history of discrimination claims that have been filed against DWP and the significant underrepresentation of African-Americans in higher-level positions does not speak well for DWP's historical treatment and promotion of minorities. However, based on the record before us we must conclude that Cornish has failed to establish a claim of either disparate treatment or adverse impact. We affirm.
 
 
 46
 AFFIRMED.
 
 
 
 *
 Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The classifications in this series are Assistant ME, Associate ME, ME, Senior Power Engineer, and Principal Power Engineer
 
 
 [2]
 DWP is organized into Systems, Divisions, Sections, Subsections, and Groups
 
 
 [3]
 Only the engineer can be a supervisor. The terms "Group Leader," "Supervisor," and "Engineer" are synonymous
 
 
 [4]
 A "reachable" candidate is one on the Eligible List
 
 
 [5]
 A plaintiff makes a prima facie case of disparate treatment by offering " 'evidence that indicates that "it is more likely than not" that the employer's actions were based on unlawful considerations.' " Jauregui, 852 F.2d at 1134 (citations omitted). A common way to establish an inference of discrimination is to provide evidence to meet the four requirements of the McDonnell Douglas test: (1) that the plaintiff is a member of a class protected under Title VII; (2) that the plaintiff applied and was qualified for a job for which the employer sought applicants; (3) that the plaintiff was rejected; and (4) that after the plaintiff was rejected, the employer either continued to seek applicants for the position or filled the position with an employee not of plaintiff's class. See McDonnell Douglas, 411 U.S. at 802; Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (superseded by statute as to its limitation of Sec. 1981 actions). This test is not to be rigidly applied, however, and courts have recognized the need to modify this test in the context of promotions. Diaz v. American Tel. & Tel., 752 F.2d 1356, 1359-61 (9th Cir.1985) (plaintiff establishes prima facie case even though individual promoted instead of plaintiff is member of same class); Jones v. Western Geophysical Co. of America, 669 F.2d 280, 284 (5th Cir.1982) (same)
 Based on its factual finding that Cornish never competed for the position of ME in I & C, the district court held that Cornish failed to establish a prima facie case of disparate impact. Presumably Cornish failed to meet the second and third prongs of the McDonnell test. However, under Cornish's articulation of the facts, he did apply for the job by virtue of being on the Eligible List and he was rejected.
 
 
 [6]
 In Aikens, the Court assumed that by refusing to grant summary judgment when the plaintiff concluded his case, the district court decided that Aikens had made out a prima facie case. 460 U.S. at 714 n. 4
 
 
 [7]
 Unfortunately, there was little relevant testimony at trial on this issue because the witnesses were given an incorrect version of Policy Sec. 15-4, and their testimonies focussed on language that was not present in the time-relevant version of Policy Sec. 15-4 and is therefore irrelevant to Cornish's claim
 
 
 [8]
 Cornish is correct that DWP records did not show the use of lateral transfers, as opposed to promotions, to fill vacancies in an ME design group when the assistant group leader was reachable
 
 
 [9]
 For example, African-Americans comprise approximately 6% of the administrators and officials while they comprise 17-20% of DWP's workforce overall
 
 
 [10]
 Cornish also refers to DWP's workforce statistics for 1981-1991, which demonstrate that African-Americans are underrepresented in the top categories of jobs relative to their overall representation in the workforce. These numbers are unhelpful to Cornish's adverse impact claim because they do not describe where ME's fit in this hierarchy, nor do they indicate which category includes the qualified labor pool
 Cornish also provides evidence that the three times a Super Associate was promoted to ME within his group, the individual was Caucasian. Finally, Cornish demonstrates that there were no African-American MEs at DWP prior to 1983. These statistics also do not demonstrate a disparity between the qualified labor market and the job in question.