UNITED STATES of America ex rel. Richard D. BAGLEY, Plaintiff,

v.

TRW, INC., et al., Defendants.

No. CV95–4153–AHM(AJWX).

United States District Court, C.D. California, Western Division.

Oct. 25, 2001.

---

Michael H. Bierman, Jeffrey D. Wexler, Sam S. Oh, Luce, Foward, Hamilton & Scripps, Los Angeles, CA, for Richard D. Bagley.

Howard F. Daniels, O'Melveny & Myers, Los Angeles, CA, Consuelo S. Woodhead, David A. Ringnell, AUSA-Office of U.S. Attorney, Civil Division, Los Angeles, CA, Vanessa I. Green, U.S. Dept. of Justice, Commercial Litigation Branch, Washington, DC, Paul F. Figley, Daniel R. Unumb, U.S. Dept. of Justice, Torts Branch Civil Division, Washington, DC, David W. Long, Howrey, Simon, Arnold & White Washington, DC, Michael F. hertz, Joyce R. Branda, U.S. Dept. of Justice, Civil Division, Washington, DC, for United States.

William A. Molinski, Orrick, Herrington & Sutcliffe, Los Angeles, CA, Stephen D. Alexander, Fried, Frank, Harris, Shriver & Jacobson, Los Angeles, CA, John T. Boese, Douglas E. Perry, John W. Chierichella, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, Geoffrey J. Ritts, Robert S. Walker, John L. Strauch, Richard J. Bedell, Jr., Jones, Day, Reavis & Pogue, Cleveland, OH, James J. Graham, James E. Gauch, Jones, Day, Reavis & Pogue, Washington, DC, for TRW, Inc.

## MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR A PROTECTIVE ORDER

WISTRICH, United States Magistrate Judge.

### Introduction

Before the court is defendant TRW, Inc.'s motion for a protective order regarding 29 inadvertently produced privileged documents.[1] Specifically, defendant asks the court to direct plaintiff United States, its counsel, and counsel for relator Richard D. Bagley ("relator"), to do the following:

(1) Return all of the Defendant's inadvertently disclosed privileged documents listed in Exhibit "A" hereto that are in their possession or the possession of any of their agents; (2) Destroy all notes or other work product reflecting the content of such documents; (3) Delete from any computer database or other computer file any information reflecting the contents of such documents; and (4) Further prohibiting them from disclosing or using any information obtained from such inadvertently disclosed documents.

[Joint Submission at 1]. The parties apparently agree that the documents fall within the scope of the attorney-client privilege. [See Joint Submission at 38 n. 11]. The only questions requiring resolution are: (1) Was the attorney-client privilege waived by defendant's inadvertent production or the documents?; and (2) Does the crime-fraud exception to the attorney-client privilege strip some of the documents of their otherwise privileged status?

### Facts [2]

In 1995, plaintiff, through the Office of the Inspector General in the Department of Defense, served two administrative subpoenas on defendant. At the time plaintiff issued the subpoenas to defendant, plaintiff was not a party to this case. Nevertheless, pursuant to a cooperation agreement, plaintiff gave relator's counsel access to the documents produced in response to the subpoenas. [See Joint Submission at 2 & 12–15].

The first subpoena, which was received by defendant on May 24, 1995, required production of documents by June 12, 1995. The second subpoena, which was received by defendant on October 2, 1995, required production of documents by October 31, 1995.[3] Defendant did not request an extension of time to respond to the October 2, 1995, subpoena. [See Joint Submission at 2 & 12–15].

Supervised by the business ethics compliance director for defendant's Redondo Beach, California, facility, and defendant's vice president and assistant general counsel, a team of in-house paralegals, legal secretaries, and non-legal personnel reviewed the documents gathered in response to the October 2, 1995, subpoena to determine if any should be withheld from production on the ground of privilege. The reviewers were given a list of attorneys who had represented defendant in the past. Lawyers provided guidance to the non-lawyers, and were available to answer questions as the review proceeded. Potentially privileged documents flagged with post-its by the privilege review team were examined by defendant's assistant general counsel, an in-house litigation attorney, or a in-house

---

1. The documents involved are listed in Exhibit A to the Joint Submission.

2. The documents which are the subject of this motion were produced by defendant in response to the October 2, 1995, subpoena. Accordingly, the following recitation of the relevant facts focuses on the circumstances surrounding defendant's production of documents in response to that subpoena.

3. Plaintiff and relator contend that the October 2, 1995, subpoena was issued on September 14, 1995. The difference in dates is inconsequential.

patent attorney. An administrative assistant removed documents identified as privileged from the documents assembled for production. [*See* Joint Submission at 4–11].

In response to the October 2, 1995, subpoena, defendant produced 95 boxes of documents (approximately 200,000 pages) by October 31, 1995. An additional 33 boxes of documents responsive to the October 2, 1995, subpoena were collected later. Those were produced on January 22, 1996. [*See* Joint Submission at 5 & 15].

Defendant withheld more than 300 documents from production on the ground of privilege. The documents withheld included a December 9, 1993, memorandum written by attorneys employed by defendant's outside law firm Fried, Frank, Harris, Shriver & Jacobson ("Fried, Frank"), and a Fried, Frank, internal document entitled "TRW IR & D/OITE issue summary." Although some copies of those documents were withheld, other copies were produced by mistake. Additional privileged documents, including some which refer to the Fried, Frank documents, also were produced. Defendant's production of privileged documents was unintentional. [*See* Joint Submission at 6].

Defendant did not discover that it had produced privileged documents on its own. Instead, in a letter dated May 22, 1997, relator's counsel notified defendant's counsel that they had encountered what appeared to be privileged documents when reviewing the documents which had been produced by defendant. Although at least some of those documents were labeled "attorney client privileged," and although relator's counsel initially assumed that the documents had been produced inadvertently, relator's counsel studied them for a couple of weeks, and shared a written analysis of them with plaintiff's counsel, before notifying defendant of their production. [*See* Joint Submission at 7–8 & 18].

Defendant's counsel immediately requested return of the documents, telephoning both relator's counsel and plaintiff's counsel on May 28, 1997, the day after defendant's counsel received the May 22, 1997, letter. That request was reiterated in a letter sent on May 29, 1997. Although defendant's request was refused, the parties agreed that the inadvertently produced privileged documents would be retained by counsel for plaintiff and relator, but would be segregated and sealed pending negotiations, and, if necessary, judicial determination, regarding their status. [*See* Joint Submission at 8 & 86 n. 29].[4]

After having been alerted that some privileged documents had been produced in response to the October 2, 1995, subpoena, defendant's outside counsel, Fried, Frank, which had not been involved in the production, began the process of reviewing defendant's production to determine whether other privileged documents had been inadvertently produced. Fried, Frank's review of defendant's production revealed that other errors had been made. Starting in November 1997, defendant began requesting the return of scores of additional privileged documents, a process that continued for over two years. [*See* Joint Submission at 9].

Defendant's compliance with its obligation to specify its privilege claim can only be described as "poor." Defendant waited a long time before serving a privilege log.[5] In a letter accompanying the October 31, 1995, production, defendant informed plaintiff that it was withholding some responsive documents on the ground of privilege, and promised to serve a privilege log with the next delivery of documents. Presumably, defendant was referring to the delivery that ultimately occurred on January 22, 1996. Similarly, in a letter accompanying defendant's January 22, 1996, production, defendant promised that a privilege log would be pro-

---

4. The fact that no motion was filed for nearly three years after this dispute arose is not evidence of a lack of diligence on either side. The parties wisely attempted to reach a negotiated resolution without involving the court. Although those efforts were not entirely successful, they did narrow the scope of the dispute significantly. [*See* Joint Submission at 10–11].

5. Rule 26(b)(5) of the Federal Rules of Civil Procedure does not require that a claim of privilege be made by means of a "privilege log" listing each document individually. *See* Advisory Committee Note to 1993 Amendment to Fed. R.Civ.P. 26. Defendant, however, correctly chose that course in this case.

vided "shortly." No privilege log (or specific claim of privilege sufficient to satisfy the requirements of Rule 26(b)(5) in a different form) was provided substantially contemporaneously with either the October 31, 1995, production or the January 22, 1996, production. Plaintiff, however, apparently did not complain about the delay. [*See* Joint Submission at 15–17].

Defendant's first privilege log, which listed 124 documents that had been produced inadvertently, was served on November 24, 1997, more than two years after defendant began its production in response to the October 2, 1995, subpoena. On December 12, 1997, defendant served a list of seventeen inadvertently produced privileged documents. On December 23, 1997, defendant identified by letter two additional privileged documents which it claimed had been produced inadvertently. On October 30, 1998, defendant provided five privilege logs listing attorney-client privileged documents. In a cover letter accompanying the October 30, 1998, privilege logs, defendant's counsel indicated that additional privilege logs were "currently being prepared and will be forwarded to you shortly." On November 6, 1998, defendant served another privilege log, this one listing an additional 115 documents. According to defendant, the documents listed on the November 6, 1998, privilege log had not been produced, but that statement was incorrect. In actuality, at least some of them had been produced. On February 16, 1999, defendant served an additional privilege log listing approximately 260 documents. Many of the documents listed on the February 16, 1999, privilege log had been produced, and some had not been listed in any of defendant's previous privilege logs. On March 10, 2000, defendant's counsel served two "consolidated privilege logs." The March 10, 2000, privilege logs did not include many of the documents listed on the previous privilege logs, and included a revision of the February 16, 1999, privilege log which reduced the number of documents identified as privileged in that privilege log from 260 to 173. On March 21,

2000, defendant served yet another privilege log. Therefore, defendant has served at least ten privilege logs listing at least 300 documents,[6] of which approximately 200 were produced to plaintiff in response to the October 2, 1995, subpoena.[7] [*See* Joint Submission at 9 & 21–26].

On March 24, 2000, defendant's counsel wrote to plaintiff's counsel that "I believe we now have, on one of these three logs ... the entire universe of documents that [defendant] continues to assert are privileged. Stated differently, if a document is not listed on one of these three logs, [defendant] is not asserting that the document is privileged." Despite that assurance, however, some uncertainty about what documents defendant claims are privileged persists. On May 9 and 10, 2000, defendant informed counsel for plaintiff and relator that additional privileged documents, not listed in any of the privilege logs previously served by defendant, also had been produced inadvertently. [*See* Joint Submission at 28–29].

Plaintiff also produced some privileged documents inadvertently. According to defendant, defendant's counsel notified plaintiff's counsel of similar oversights on more than a dozen occasions, and promptly complied with requests from plaintiff's counsel that privileged documents inadvertently produced by plaintiff be returned. [*See* Joint Submission at 9–10].

### Discussion

#### 1. Choice of Law and Burden of Persuasion

Application of the attorney-client privilege is governed by federal common law in this case because federal law provides the rule of decision. *See* Fed.R.Evid. 501; *United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); *Clarke v. American Commerce National Bank,* 974 F.2d 127, 129 (9th Cir.1992); *Religious Technology Center v. Wollersheim,* 971 F.2d 364, 367 n. 10 (9th Cir.1992). The question

---

**6.** Defendant contends that the actual number is closer to 500. [*See* Defendant's Supplemental Brief at 3 n. 2]. In the circumstances of this case, the difference is immaterial.

**7.** Some of the listed documents are duplicates or nonidentical copies of other listed documents.

whether the privilege has been waived [8] also is governed by federal common law in this case. *See, e.g., Weil v. Investment/Indicators, Research and Management, Inc.,* 647 F.2d 18, 24 n. 12 (9th Cir.1981); *Federal Deposit Insurance Corp. v. Fidelity & Deposit Co. of Maryland,* 196 F.R.D. 375, 378–381 (S.D.Cal.2000). Accordingly, in briefing this motion, both parties have relied exclusively on federal law.[9]

■ The burden of persuasion rests on the party claiming the privilege. *See, e.g., United States v. Zolin,* 809 F.2d 1411, 1415 (9th Cir.1987), *aff'd in part and vacated in part,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), *overruled on other grounds, United States v. Jose,* 131 F.3d 1325, 1329 (9th Cir. 1997) (en banc); *United States v. Gann,* 732 F.2d 714, 723 (9th Cir.1984), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984); *Weil,* 647 F.2d at 25. This principle extends to all of the elements of the privilege, including an affirmative demonstration of non-waiver if the issue of waiver has been raised. *Zolin,* 809 F.2d at 1415; *United States v. Landof,* 591 F.2d 36, 38 (9th Cir. 1978). When the court is in equipoise, a tie should be awarded to the privilege holder, at least when the attorney-client privilege is involved. *See United States v. Mett,* 178 F.3d 1058, 1065 (9th Cir.1999) (stating that "where [the] attorney-client privilege is con-

cerned, hard cases should be resolved in favor of the privilege, not in favor of disclosure").

■ Rule 26(c) of the Federal Rules of Civil Procedure provides that upon a showing of good cause, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...." The party seeking a protective order has the burden of showing the existence of good cause. *See San Jose Mercury News, Inc. v. United States District Court,* 187 F.3d 1096, 1103 (9th Cir.1999). To establish good cause, a party must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements[.]" *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) (quoting *In re Halkin,* 598 F.2d 176, 193 (D.C.Cir.1979)); *see San Jose Mercury News,* 187 F.3d at 1103 (indicating that a "particularized showing" is necessary).

## 2. Waiver By Inadvertent Production

■ "The inadvertent production of a privileged document is a specter that haunts every document intensive case." *Federal Deposit Insurance Corp. v. Marine Midland Realty Credit Corp.,* 138 F.R.D. 479, 479–480

---

8. Using the term "waiver" to describe the consequences of the inadvertent production of privileged documents is customary but misleading. Such a "waiver" is not really a waiver in the true sense, but is more accurately viewed as a "forfeiture" designed "to punish the person claiming the privilege for a mistake." *See Dellwood Farms, Inc. v. Cargill, Inc.,* 128 F.3d 1122, 1127 (7th Cir.1997). Using the term "wavier" creates confusion because a wavier is usually defined as the intentional relinquishment of a known right. *See* Black's Law Dictionary 1574 (7th ed. 1999) ("The party alleged to have waived a right must have had both knowledge of the existing right and the intention of foregoing it."). By definition, the inadvertent production of privileged documents is not an intentional relinquishment of the privilege.

9. Because defendant's production occurred in California and was made in response to a federal administrative subpoena rather than in response to a request for production or a subpoena served in this case, it is conceivable that state privilege law might apply. The parties have not addressed

this possibility. If California law applies, however, a finding of waiver would be less likely than if federal law applies. *See KL Group v. Case, Kay & Lynch,* 829 F.2d 909, 919 (9th Cir.1987) (holding that the inadvertent production of a document by counsel did not waive the attorney-client privilege)(applying California and Hawaii law)(citing *American Mutual Liability Insurance Co. v. Superior Court,* 38 Cal.App.3d 579, 595, 113 Cal.Rptr. 561 (1974)). Although in this case the privileged documents were mistakenly produced by in-house counsel, rather than by outside counsel, California's emphasis on the subjective intent of the client suggests that the result would be the same regardless of who committed the error. *See Federal Deposit Insurance Corp.,* 196 F.R.D. at 380 ("Under California law, waiver of the attorney-client privilege depends entirely on whether the client provided knowing and voluntary consent to the disclosure.") (citing *State Compensation Insurance Fund v. WPS, Inc.,* 70 Cal.App.4th 644, 652–654, 82 Cal.Rptr.2d 799 (1999) and *O'Mary v. Mitsubishi Electronics America, Inc.,* 59 Cal.App.4th 563, 577, 69 Cal. Rptr.2d 389 (1997)).

(E.D.Va.1991); *see* Note, Inadvertent Disclosure of Documents Subject to the Attorney–Client Privilege, 82 Mich. L.Rev. 598, 599 (1983) ("Privileged documents can easily slip through a screening procedure into adversaries' hands. This problem has become increasingly common as litigation and document productions grow in size.") (footnotes omitted). Every lawyer knows, or should know, that producing a privileged document by mistake may waive or forfeit the privilege. *See* Richard L. Marcus, The Perils of Privilege: Waiver and the Litigator, 84 Mich. L.Rev. 1605, 1606 (1986) ("During discovery, any slip-up in screening materials that are produced can result in waiver.").

■ Courts have analyzed the question whether the inadvertent disclosure of privileged documents waives the attorney-client privilege in a variety of ways. *See Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir.1993) ("[T]here is no consensus ... as to the effect of inadvertent disclosures of confidential communications."). As experience with the issue has grown, three general approaches have emerged.

> The first might be termed the strict liability approach, so that any non-privileged disclosure, no matter how slight and no matter to whom, forfeits the privilege. The second is the subjective intent approach, so that only a deliberate disclosure forfeits the privilege. The third might be called the skeptical balancing approach, in which the court considers all the relevant circumstances ....

*Simon Property Group L.P. v. mySimon, Inc.*, 194 F.R.D. 644, 648 (S.D.Ind.2000) (citations omitted); *see also VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8, 11 (D.Mass.2000) ("One approach holds that inadvertent disclosure constitutes a waiver. A second approach ... holds that inadvertent disclosure always constitutes a waiver. A third approach ... holds that inadvertent disclosure only constitutes a waiver, if, in view of the totality of the circumstances, adequate measures were not taken to avoid the disclosure.") (citations omitted). The third approach has been called the "middle test", the "pragmatic approach", the "totality of the circumstances approach," and the like. *See, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 291 (D.Mass.2000).

The advantages of the totality of the circumstances approach have been summarized as follows:

> The middle test is best suited to achieving a fair result. It accounts for the errors that inevitably occur in modern, document-intensive litigation, but treats carelessness with privileged material as an indication of waiver. The middle test provides the most thoughtful approach, leaving the trial court broad discretion as to whether waiver occurred and, if so, the scope of that waiver. It requires a detailed court inquiry into the document practices of the party who inadvertently released the document.

*Gray v. Bicknell*, 86 F.3d 1472, 1484 (8th Cir.1996) (applying Missouri law).

The totality of the circumstances approach does not destroy the beneficial effect of a rule empowering the court find a waiver in some situations. The risk of waiver remains to discourage carelessness in the handling of privileged documents, as well as to prevent unfairness to the receiving party if, through no fault of the receiving party, the privileged information has been integrated into the case. In addition, even if inadvertently produced privileged material cannot be used formally, it may be used informally, at least in the sense that the receiving party's view of the case unavoidably will be informed by it. Perhaps most important, counsel who handle a document production sloppily lose both credibility and clients, regardless of whether the court finds that a waiver occurred. Thus, under the totality of the circumstances approach, adequate incentives for taking sensible precautions to prevent the inadvertent disclosure of privileged material persist. *See Simon Property Group*, 194 F.R.D. at 649 (observing that "the balancing test does not pose any serious risk of undermining incentives for parties and lawyers to be careful about protecting privileged documents"). Not surprisingly, most courts have found the reasoning presented in *Gray* persuasive,[10]

---

10. The rationale articulated in *Gray*, though not

necessarily its overall endorsement of the totality

and have adopted the third approach, choosing to analyze the totality of the circumstances to determine whether inadvertent production should result in a waiver.

Like most courts elsewhere, courts within the Ninth Circuit have embraced the totality of the circumstances approach. In the Ninth Circuit, the inadvertent production of privileged documents is neither a necessary nor a sufficient condition for finding that the privilege was waived. *See Gomez v. Vernon,* 255 F.3d 1118, 1131–1132 (9th Cir.2001) (citing *United States v. de la Jara,* 973 F.2d 746, 749–750 (9th Cir.1992)), *pet. for cert. filed* (October 9, 2001); *Weil,* 647 F.2d at 24. Instead, in determining whether a privilege has been waived by the inadvertent production of privileged documents, courts within the Ninth Circuit consider "the circumstances surrounding the disclosure," including whether the privilege holder has made efforts " 'reasonably designed' to protect and preserve the privilege." *de la Jara,* 973 F.2d at 749–750 (quoting *Transamerica Computer*

Co. *v. International Business Machines Corp.,* 573 F.2d 646, 650, 652 (9th Cir.1978)); *see Gomez,* 255 F.3d at 1131–1132.

■ To guide analysis in cases in which privileged documents have been produced inadvertently, courts adopting the totality of the circumstances approach—including several district courts within the Ninth Circuit—typically use a five-factor test. As the test is usually phrased, the factors are:

(1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the "overriding issue of fairness."

*Hartford Fire Insurance Co. v. Garvey,* 109 F.R.D. 323, 332 (N.D.Cal.1985) (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985)); *see, e.g., Cunningham v. Connecticut Mutual Life Insurance,* 845 F.Supp. 1403, 1409 (S.D.Cal.1994); *In re Sause Brothers Ocean Towing,* 144 F.R.D. 111, 115 (D.Or.1991);

of the circumstances approach, may be questioned in a couple of respects. First, it draws an inference that is seldom warranted when privileged material is produced inadvertently, namely, that carelessness actually is "an indication of waiver." *See Federal Deposit Insurance Corp.,* 196 F.R.D. at 380 ("Inadvertent disclosure during discovery by no stretch of the imagination shows consent to the disclosure: It merely demonstrates that the poor paralegal or junior associate who was lumbered with the tedious job of going through voluminous files and records in preparation for a document production may have missed something. [Plaintiff] invites us to adopt a 'gotcha' theory of waiver, in which an underlying's slip-up in a document production becomes the equivalent of actual consent. We decline. The substance of an inadvertent disclosure under such circumstances demonstrates that there was no voluntary release.")(quoting *O'Mary,* 59 Cal. App.4th at 577, 69 Cal.Rptr.2d 389).

Second, it requires the court to scrutinize the procedures followed by the producing party in producing its documents, and to make a decision that cannot readily be predicted by counsel for the producing party before the deadline for production when document review procedures are designed. This means that counsel for the producing party cannot be sure about what procedures will be sufficient to avoid a waiver if a mistake is made. The result may be socially wasteful behavior, such as the adoption of elaborate and expensive precautions to avoid the inadvertent production of privileged documents, the cost·of which may far exceed the social cost of

alternative ways of solving the problem, such as by simply requiring the receiving party to return all inadvertently produced privileged documents to the producing party immediately. For example, the totality of the circumstances approach creates an incentive for a party producing documents to request lengthy extensions of time to complete its production, and to use associates, or even partners, rather than paralegals or clerks, to review the documents slated for production and to make privilege determinations. *See Zapata v. IBP, Inc.,* 175 F.R.D. 574, 577 (D.Kan.1997) ("Where document production is extensive ... a finding that an inadvertent disclosure of privileged documents waives the attorney-client privilege or work-product protection does not advance the aim of full and free discovery. Parties might tend to produce fewer documents or delay production for fear of losing protection for otherwise valid privilege claims."); *James Julian, Inc. v. Raytheon Co.,* 93 F.R.D. 138, 142 (D.Del.1982) (rejecting the argument that a privilege was waived because inadvertently produced privileged materials had not been stored in a special confidential file, and observing that "[t]o hold otherwise would be to require every corporation to maintain at least two sets of files. Moreover, a screening committee would then have to be set up whereby some designated official could pass on the need of each employee to know the contents of any requested document.").

Despite these shortcomings of the totality of the circumstances approach and its rationale, it is preferable to the strict liability approach.

*Eureka Financial Corp. v. Hartford Accident & Indemnity Co.*, 136 F.R.D. 179, 184 (E.D.Cal.1991); *Bud Antle, Inc. v. Grow-Tech Inc.*, 131 F.R.D. 179, 183 (N.D.Cal. 1990); *see generally* John T. Hundley, Annotation, Waiver of Evidentiary Privilege by Inadvertent Disclosure—Federal Law, 159 A.L.R. Fed. 153, 2000 WL 150764 (2000); John T. Hundley, Annotation, Waiver of Evidentiary Privilege by Inadvertent Disclosure—State Law, 51 A.L.R. 5th 603, 1998 WL 2606 (1998); John T. Hundley, "Inadvertent Waiver" of Evidentiary Privileges: Can Reformulating the Issue Lead to More Sensible Decisions?, 19 S. Ill. U. L.J. 263 (1995); Roberta N. Harding, Waiver: A Comprehensive Analysis of a Consequence of Inadvertently Producing Documents Protected by the Attorney–Client Privilege, 42 Cath. U.L.Rev. 465 (1993); Alan J. Meese, Inadvertent Waiver of the Attorney–Client Privilege by Disclosure of Documents: An Economic Analysis, 23 Creighton L.Rev. 513 (1990).[11]

The *Lois Sportswear* decision contains the seminal discussion of the totality of the circumstances approach to the problem of inadvertent production. *See Hartford Fire Insurance*, 109 F.R.D. at 331–332 (describing the *Lois Sportswear* decision as a "complete and careful analysis which correctly reflects the majority rule on inadvertent production"). Neither party has questioned the applicability of the *Lois Sportswear* test, or

challenged the appropriateness of steering the middle course between the strict rule that disclosure always constitutes a waiver and the forgiving rule that disclosure never results in a waiver unless a waiver actually was subjectively intended.

It is noteworthy that the five factors extracted by courts from the *Lois Sportswear* decision do not completely or accurately reflect the nuances of that court's discussion of the issue. What that court actually said was:

> What is at issue here is whether or not the release of the documents was a knowing waiver or simply a mistake, immediately recognized and rectified. The elements which go into that determination include the reasonableness of the precautions to prevent inadvertent disclosure, the time taken to rectify the error, the scope of the discovery and the extent of the disclosure. There is, of course, an overreaching issue of fairness and the protection of an appropriate privilege which, of course, must be judged against the care or negligence with which the privilege is guarded with care and diligence or negligence and indifference.

*Lois Sportswear*, 104 F.R.D. at 105. The somewhat awkward phrasing of the last sentence probably contributed to the disparate rephrasings and interpretations of the test in later decisions.[12] Presumably, what the *Lois*

**11.** Although the five-factor test has been employed by district courts within the Ninth Circuit, the Ninth Circuit itself has not expressly adopted it. Moreover, dicta in Ninth Circuit decisions suggest that the totality of the circumstances approach might be applied less generously to the privilege holder in this circuit than elsewhere. For example, the Ninth Circuit has noted that often it is "unnecessary to look beyond the objective fact of disclosure in ruling on the question of waiver." *Weil* 647 F.2d at 25 n. 13. It also has indicated that only in "a truly exceptional and a unique situation" should a court find that inadvertent production of privileged material does not constitute a waiver. *Transamerica Computer Co.*, 573 F.2d at 651. Finally, the Ninth Circuit has stated that "we will deem the privilege to be waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter." *de la Jara*, 973 F.2d at 750. Nevertheless, it is likely that the Ninth Circuit would adopt some form of the five-factor test, rather than a strict liability approach, if the question were squarely presented to it. *See Go-*

*mez*, 255 F.3d at 1131–1132; *de la Jara*, 973 F.2d at 749–750; *see generally Clady v. Los Angeles County*, 770 F.2d 1421, 1433–1434 (9th Cir.1985) (stating that inadvertence is "only one factor to be considered" in determining whether a waiver occurred), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986).

**12.** Despite the popularity of the test, courts and commentators have slowly drifted away from the precise language used in the *Lois Sportswear* decision, even as that language was modified in the *Hartford Fire Insurance* decision. Perhaps the most elegant of these variations is the following:

(1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error.

*Sportswear* court meant to say in the last sentence was "an [*overarching* (or *overriding* )] issue of fairness [*in* ] the protection of an appropriate privilege." Courts have so paraphrased it. *See, e.g., Hartford Fire Insurance,* 109 F.R.D. at 332; *Local 851 of International Brotherhood of Teamsters v. Kuehne & Nagel Air Freight, Inc.,* 36 F.Supp.2d 127, 134 (E.D.N.Y.1999). If the *Lois Sportswear* court actually meant "and" rather than "in," then perhaps the case suggested consideration of six factors rather than five. Whatever the court in *Lois Sportswear* actually meant to say, it makes sense that both fairness to the parties and the policies promoted by the particular privilege involved should be considered along with the other circumstances.

Although multi-factor tests such as the *Lois Sportswear* test are useful in identifying relevant considerations, they should not be applied mechanistically. *Cf. Valley Engineers Inc. v. Electric Engineering Co.,* 158 F.3d 1051, 1057 (9th Cir.1998)(noting that the five-factor test for imposing involuntary dismissal as a sanction merely serves to structure judicial analysis of the issue), *cert. denied,* 526 U.S. 1064, 119 S.Ct. 1455, 143 L.Ed.2d 542 (1999). Therefore, the *Lois Sportswear* test will be employed simply as a guide to the exercise of discretion in determining whether a waiver occurred.

■ The first factor—the reasonableness of the precautions taken to prevent inadvertent disclosure—favors defendant. The challenges posed by a large-scale document production are familiar. A two-layer system of pre-production review—in which relatively ministerial determinations are made by employees of the producing party or by clerks, paralegals, or inexperienced associates employed by a law firm, and in which the final decision about what documents should or should not be produced is made by experienced in-house or outside lawyers—is not unusual. That is the general procedure followed by defendant in this instance. In addition to providing meaningful protection for privileged documents, such an approach reduces the transaction costs of litigation by allowing individuals with less experience and training—and, if the review is performed by outside counsel, correspondingly lower billing rates—to perform the most time-consuming and routine tasks. Punishing defendant for adopting this common, reasonable, and cost-effective strategy would not make sense. It also would unwisely discourage other litigants from adopting an economical procedure in the future.

Some cases criticize the use of non-lawyer personnel to segregate potentially privileged documents, *see e.g., Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 445 (S.D.N.Y.1995) (suggesting that only attorneys should perform any substantive aspect of a privilege review); *Aramony v. United Way of America,* 969 F.Supp. 226, 236–237 (S.D.N.Y.1997) (indicating that using paralegals instead of attorneys to conduct a privilege review was reasonable only in exigent circumstances and if the paralegals are properly supervised), or the use of post-it notes to mark documents that should be reviewed by a more experienced lawyer or withheld from production, *see Bank Brussels Lambert,* 160 F.R.D. at 445 (suggesting that post-it notes should not be used because they may be easily overlooked or dislodged) (citing *International Digital Systems Corp. v. Digital Equipment Corp.,* 120 F.R.D. 445, 448 (D.Mass.1988)), both of which defendant did in this case. This degree of retrospective judicial micro-management and second-guessing, however, is impractical and unfair.

As defendant correctly observes, " 'reasonable' precautions are not necessarily foolproof." *Bank Brussels Lambert,* 160 F.R.D. at 443. Carelessness should not be inferred merely because an inadvertent production of privileged documents occurred. The reasonableness of the precautions adopted by the producing party must be viewed principally from the standpoint of customary practice in the legal profession at the time and in the location of the production, not with the 20–20

---

3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.42[4] (2d ed.2000) (citing *Hydraflow, Inc. v. Enidine, Inc.,* 145 F.R.D. 626, 637 (W.D.N.Y.1993)). The *Hydraf-*

*low* decision adopted this particular rephrasing of the *Lois Sportswear* test from *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46, 50 (M.D.N.C.1987).

vision of hindsight.[13] *See* Jeffrey J. Rachlinski, A Positive Psychological Theory of Judging in Hindsight, 65 U. Chi. L.Rev. 571, 576–602 (1998) (explaining why hindsight judgments can be misleading, not to mention unfair to the person or entity whose conduct is being examined after the fact); *see also International Digital Systems*, 120 F.R.D. at 449 (criticizing the *Lois Sportswear* test because "the opinions of the courts in these cases, after a substantial amount of verbiage, can be reduced to a bottom line to the effect that the precautions were inadequate because they were not effective in preventing the disclosure of privileged documents. If the precautions had been adequate, the disclosure would not have occurred. Frankly, I do not see this as a significant advance in jurisprudence."). The procedures followed by defendant in producing its documents might have been better, but they were not so poorly designed as to fall below reasonable contemporary standards in this legal community. The fact that some of the documents were labeled "attorney-client privilege" weighs in defendant's favor as well. *Cf. Local 851*, 36 F.Supp.2d at 132 (stating that it was "[m]ost notabl[e]" with regard to the first factor that the producing party had failed to label an inadvertently produced document as privileged).

The second factor—the time taken to rectify the error—favors plaintiff and relator. Defendant did not discover its mistake. Instead, several months after the documents were produced, plaintiff and relator brought the problem to defendant's attention. Defendant took some steps promptly upon learning of its mistake, such as quickly requesting that the documents be returned or sealed. While this is a point in defendant's favor, *see Zapata v. IBP, Inc.*, 175 F.R.D. 574, 577 (D.Kan.1997) ("The relevant time for rectifying any error begins when a party discovered or with reasonable diligence should have discovered the inadvertent disclosure."); *Aramony*, 969 F.Supp. at 237 ("The period after the producing party realizes that privileged information has been disclosed is the relevant period for measuring whether the privilege

has been waived."), it is not dispositive as to this factor in the circumstances presented by this case. Equally significant is defendant's subsequent delay in completing its follow-up review of its production to ensure that other privileged documents also had not been produced inadvertently. Indeed, defendant never really got control over the situation. It served numerous inconsistent, overlapping privilege logs, all long after they should have been provided. *Cf. Bud Antle*, 131 F.R.D. at 183 (concluding that the plaintiff's failure to serve a privilege log until six weeks following the production of documents was evidence that reasonable precautions had not been taken). More than three years after defendant's original production of documents took place, documents that defendant alleges are privileged, but which were not listed on any of its numerous privilege logs, were still turning up among the documents defendant had produced. In sum, once defendant learned that privileged documents had been produced by mistake, it should have corrected the problem more swiftly and effectively than it did.

The third factor—the scope of the discovery—favors defendant. Defendant estimates that it produced approximately 200,000 documents in response to the October 2, 1995, subpoena. That number—not some larger number—is the relevant universe of documents, since there apparently is no contention that privileged documents were produced inadvertently in response to the May 1995 subpoena. Although it is easy to cite examples of much larger document productions, *see, e.g., Transamerica Computer Co.*, 573 F.2d at 648 (17 million pages of documents produced), it is likely that as many as 200,000 documents are produced in fewer than one percent of all cases filed in the federal courts. *See Lazar v. Mauney*, 192 F.R.D. 324, 330 (N.D.Ga.2000) (describing a production of 1,000 pages as "voluminous"); *Zapata*, 175 F.R.D. at 577 (describing 40,000 documents as an "enormous number"); *Bank Brussels Lambert*, 160 F.R.D. at 446 (describing a production of 120,000 pages as

---

**13.** Indeed, plaintiff and relator invite the court to rely on hindsight when they argue that "whatever 'precautions' defendant may have taken, they were per se unreasonable when 200 documents were produced to plaintiffs." [Joint Submission at 55].

"immense"). In a production of that magnitude, it is likely, if not inevitable, that some mistakes will be made, no matter how reasonable are the precautions taken and no matter how diligent and well-trained are the persons charged with implementing those precautions. *See United States v. Gangi*, 1 F.Supp.2d 256, 266 (S.D.N.Y.1998) ("Where numerous documents are involved and thousands of pages are produced, errors are more understandable."); *Zapata*, 175 F.R.D. at 578 ("Common sense suggests that a party might inadvertently fail to keep within its grasp one or two documents in the course of producing 1,500,000.") (quoting *In re Wyoming Tight Sands Antitrust Cases*, 1987 WL 93812, at *5 (D.Kan.1987)).

The fourth factor—the extent of the disclosure—favors plaintiff and relator. The absolute number of privileged documents produced—estimated by the parties to be between 200 and 300—is relatively large compared to many inadvertent productions described in reported cases. *Compare Lazar*, 192 F.R.D. at 330 (concluding that the privilege was not waived when three privileged documents were produced along with about 1,000 other documents) and *Lois Sportswear*, 104 F.R.D. at 105 (concluding that the privilege was not waived when 22 privileged documents were mistakenly produced along with 16,000 other documents) *with Local 851*, 36 F.Supp.2d at 133 (concluding that the privilege was waived when one privileged document was filed along with six other exhibits to a motion). On the other hand, the ratio of privileged documents produced to all documents produced is roughly the same in this case as it was in the *Lois Sportswear* case, where no waiver was found.[14] The court has no way of comparing the inadvertently produced privileged documents to all privileged documents possessed by defendant, either quantitatively or qualitatively.[15] The material fully disclosed by defendant, however, did include at least one relevant and highly significant attorney-client communication. Finally, plaintiff had the privileged documents

in its actual or constructive possession for more than a year before the inadvertent production of privileged documents was discovered.

The fifth factor—fairness—weighs in favor of defendant. To begin with, in determining whether an inadvertent production of privileged material amounts to a waiver, the importance of the attorney-client privilege should not be ignored. "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998). "The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin*, 524 U.S. at 403, 118 S.Ct. 2081 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)); *accord Gomez*, 255 F.3d at 1131. "That purpose, of course, requires that clients be free 'to make full disclosure to their attorneys' ... in order that the client may obtain 'the aid of persons having knowledge of the law and skilled in its practice.'" *Zolin*, 491 U.S. at 562, 109 S.Ct. 2619 (quoting *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) and *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888)).

Like all other privileges, the attorney-client privilege is a double-edged sword insofar as the legal system is concerned. *See Zolin*, 491 U.S. at 562, 109 S.Ct. 2619 (noting that the attorney-client privilege is "not without its costs"). From a microscopic perspective, it impairs the fact-finding process by depriving it of what might be highly relevant information in particular cases. From a wide-angle perspective, it facilitates compliance with the substantive law and promotes the values underlying the adversary system of adjudication. The legal system has adopted the wide-angle perspective, endors-

14. If the producing party in *Lois Sportswear* had produced about as many documents as defendant, and if the ratio of priviliged and unpriviliged documents had remained constant then it would have produced approximately 275 privileged documents.

15. However, if defendant's count is accepted, defendant inadvertently produced nearly one-half of the privileged documents which were responsive to the October 2, 1995, subpoena. [*See* Defendant's Supplemental Brief at 3 n. 2].

ing the view that advantages of the attorney-client privilege outweigh its disadvantages. Therefore, society—not just the producing party—has an interest in avoiding a waiver. Not surprisingly, courts are somewhat reluctant to pierce the attorney-client privilege, especially where the conduct allegedly constituting a waiver was unintentional. *See Dellwood Farms, Inc. v. Cargill, Inc.,* 128 F.3d 1122, 1126 (7th Cir.1997) (defining "inadvertent disclosure" as "where a party mistakenly discloses information that it had intended to keep secret," and observing that "[c]ourts are somewhat less likely to find waiver" when disclosure was inadvertent than when disclosure was intentional and selective).

A party to whom privileged documents are produced inadvertently, by contrast, has no inherent "fairness" interest in keeping them, unless the producing party waited so long to address the problem after having been informed of it that the receiving party reasonably changed its position in reliance upon their continued availability. *See Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.,* 133 F.R.D. 171, 174 (D.Kan.1989) ("Defendant fortuitously obtained the privileged documents. It could not have expected to obtain them and could not have reasonably relied on them. To the

extent defendant did rely on them, it did so without plaintiffs' knowledge or consent."). This is especially apt where, as here, some of the documents were labeled "attorney-client privileged," and attorneys mentioned in the documents were known by the receiving party to be the producing party's litigation counsel at the time the documents were studied. In these circumstances, any reliance by plaintiff or relator on the continued availability of the documents would be unjustifiable. *See Gomez,* 255 F.3d at 1132–1134 (affirming the imposition of monetary sanctions for bad faith misconduct because opposing counsel acquired, studied, and retained documents that were labeled "privileged" or were on the letterhead of opposing counsel).

In addition, the privileged documents have not been used in this case because the parties agreed that they would be segregated and sealed. If, through no fault of the receiving party, the privileged documents had been woven into the fabric of the case, that might weigh in favor of a finding of waiver.[16] Where, as here, the receiving party handled the documents somewhat appropriately, by disclosing that they had been produced relatively promptly, and by segregating and sealing them immediately when requested to do so, that weighs against a finding of waiver.[17]

---

**16.** One of the problems with the *Lois Sportswear* test is that it arguably places some control over the waiver determination in the hands of the receiving party. If the receiving party uses inadvertently produced privileged documents extensively, even without the producing party's knowledge, that might increase the likelihood of a finding of waiver. *See Baxter Travenol Laboratories, Inc. v. Abbott Laboratories,* 117 F.R.D. 119, 121 (N.D.Ill.1987) (explaining that "[w]here prior to the assertion of the privilege, the documents have been examined and used by the opposing party, it may be unfair and unrealistic to uphold the privilege," and holding that a waiver occurred where the receiving party repeatedly used and relied on the documents in its court filings) (citing *In re Grand Jury Investigation of Ocean Transportation,* 604 F.2d 672, 674–675 (D.C.Cir.1979), *cert. denied,* 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979)); *Central Die Casting & Mfg. Co., Inc. v. Tokheim Corp.,* 1994 WL 444796, at *5 (N.D.Ill.1994) (finding a waiver of the privilege where the receiving party used the inadvertently produced document in its motion for summary judgment). This makes little sense, at least where, as in this case, the receiving party knew or reasonably should have known

that the documents probably were privileged and likely had been produced inadvertently.

**17.** Relator's counsel should have contacted defendant even sooner than they did after discovering that documents marked "attorney-client privileged" had been included among the documents produced by defendant. [*See* Joint Submission at 49]. Relator's counsel should not have analyzed the contents of obviously privileged documents, or disclosed them (or an analysis of their contents) to plaintiff's counsel, but instead should have segregated and sealed them, immediately notified defendant of the situation, and awaited defendant's instructions or guidance from the court. Obviously plaintiff and relator should not benefit simply because relator's counsel studied apparently privileged documents which they suspected had been inadvertently produced for a couple of weeks after finding them.

The fact that there may not have been a formal ethical rule applicable to relator's counsel requiring immediate sealing and notification at the time when relator's counsel discovered the inadvertently produced privileged documents is beside the point. Although the authorities were

With a few notable exceptions—such as the document about which a witness was questioned during a deposition—the inadvertently produced privileged documents have not been formally used during this case.

The potential value of the inadvertently-produced privileged documents to the receiving party is beside the point. *Kansas City Power & Light*, 133 F.R.D. at 174 (indicating that the fact that inadvertently produced documents are relevant, or even helpful to the receiving party, is not dispositive). The waiver determination should not turn on whether the continued availability of the privileged documents would benefit the receiving party, or to what extent. *See Bank Brussels Lambert*, 160 F.R.D. at 446 (stating that "the relevance of a privileged document to the merits of the litigation does not make it unjust to withhold it from discovery. The

not uniform, many authorities supported such an approach. *See, e.g., Transportation Equipment Sales Corp. v. BMY Wheeled Vehicles*, 930 F.Supp. 1187, 1188 (N.D.Ohio 1996) (holding that upon discovering that privileged documents have been produced, the receiving party should segregate them, notify the producing party, and abide by the producing party's instructions regarding their disposition); *Milford Power Ltd. Partnership by Milford Power Associates, Inc. v. New England Power Co.*, 896 F.Supp. 53, 58 (D.Mass.1995) (concluding that counsel receiving inadvertently produced privileged documents had "a clear obligation to return" them); *Resolution Trust Corp. v. First of America Bank*, 868 F.Supp. 217, 220 (W.D.Mich.1994) (stating that "common sense and a high sensitivity toward ethics and the importance of attorney-client confidentiality and privilege should have immediately caused the plaintiff's attorneys to notify defendant's counsel of his office's mistake" inadvertently producing a letter that was marked as privileged); *Telephonics Corp. v. United States*, 32 Fed.Cl. 360, 362 (1994) (characterizing the knowing reading of inadvertently produced privileged documents as a "sharp practice"); ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 368, Inadvertent Disclosure of Confidential Materials (November 10, 1992) (stating that "receiving counsel's obligations ... are to avoid reviewing the materials, notify sending counsel if sending counsel remains ignorant of the problem and abide [by]· sending counsel's direction as to how to treat the disposition of the confidential materials").

More recent decisions also support this view. *See, e.g., Gomez*, 255 F.3d at 1132 (citing ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 368 (1992) with approval, and noting that it "reflect[s] some of the same principles articulated in *Zolin*"); *State Compensation Insurance Fund v. WPS, Inc.*, 70 Cal.App.4th 644, 656–657, 82 Cal.Rptr.2d 799 (1999) ("[W]e hold that the obligation of an attorney receiving privileged documents due to the inadvertence of another is as follows: When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the

materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified. We do, however, hold that whenever a lawyer ascertains that he or she may have privileged attorney-client material that was inadvertently provided by another, that lawyer must notify the party entitled to the privilege of that fact."); *Lazar*, 192 F.R.D. at 330 ("At best, these situations are resolved amicably, by counsel returning documents which are *obviously privileged and inadvertently produced*. It is *unfortunate* that such could not be the case here and that the [c]ourt was forced to expend a great deal of time on this relatively minor matter.") (quoting *United States v. Pepper's Steel & Alloys, Inc.*, 742 F.Supp. 641, 643–644 (S.D.Fla.1990)) (emphasis added by the *Lazar* decision) (applying Georgia law); Gloria A. Kristopek, To Peek or Not to Peek: Inadvertent or Unsolicited Disclosure of Documents to Opposing Counsel, 33 Val. U.L.Rev. 643, 680–686 (1999) (proposing a model ethics rule that would require the receiving party to stop reviewing apparently privileged documents, notify the producing party, and follow the producing party's instructions concerning return of the documents); *see generally* Trina Jones, Inadvertent Disclosure of Privileged Information and the Law of Mistake: Using Substantive and Legal Principles to Guide Ethical Decision Making, 48 Emory L.J. 1255 (1999).

Whatever may be the proper result in other contexts, when inadvertent disclosure of obviously privileged materials is made to opposing counsel, it seems appropriate, given the importance of the policies promoted by the attorney-client privilege, to shift some of the responsibility for promoting the policies of the privilege to the lawyer who received the inadvertent disclosure. *Gomez*, 255 F.3d at 1134 ("The notion that receipt of privileged communications imposes a duty on counsel to take some reasonable remedial action is hardly a novel concept. It stems from common sense, ethical rules and the origins of the privilege."). Because some mistakes are inevitable, the receiving party sometimes is in the best position to avoid the societal costs of a waiver. Whether the result should be the same if inadvertent disclosure is made to a *pro se* litigant, or if the documents are not obviously privileged, are matters that need not be decided in this case.

prejudice factor focuses only on whether the act of restoring immunity to an inadvertently disclosed document would be unfair, not whether the privilege itself deprives parties or pertinent information."); *see also Lois Sportswear,* 104 F.R.D. at 105 (suggesting that what matters is the fairness of depriving the producing party of a valid privilege). If that were the test, the fifth factor would always favor the receiving party.

Finally, plaintiff and relator argue that this motion should be denied because "the bell has already been rung." *Bud Antle,* 131 F.R.D. at 184. There is some support for this view. *See, e.g., Carter v. Gibbs,* 909 F.2d 1450, 1451 (Fed.Cir.1990) ("Voluntary disclosure of attorney work product to an adversary in the litigation for which the attorney produced that information defeats the policy underlying the privilege .... Granting the motion would do no more than seal the bag from which the cat has already escaped.") (citations omitted); *International Digital Systems,* 120 F.R.D. at 449 ("[T]here is no order I can enter which erases from defendant's counsel's knowledge what has been disclosed."). On the other hand, this view rests on an unduly narrow conception of the interests protected by the privilege. The privilege protects against both disclosure and use. Preventing the latter is sufficient to promote at least one of the purposes of the privilege. *See* 2 Paul R. Rice, Attorney–Client Privilege in the United States § 9:77 (1999) ("The privilege can meet its goal of encouraging more open communication from client to attorney independent of whether the communications are made in the confidential setting. It is the client's fear of the subsequent use of his communications against him, and the embarrassment that might result, which inhibits candid communication with the attorney, and the privilege eliminates this fear. While the imposition of a requirement of confidentiality is consistent with the privilege's protection of the client's privacy, it does not further any end that suppression by the privilege does not automatically achieve."). As one commentator has explained:

It is true that confidentiality can never be restored to a communication that has been disclosed. This loss of confidentiality can be particularly harmful when disclosure of documents is made to one who is an adversary outside the context of the litigation, such as a business competitor. But the damage need not extend to the litigation at hand. Litigation takes place in a controlled environment where a lack of confidentiality outside the courtroom is irrelevant to the proceedings within. For all practical purposes, a court can repair the damage done by disclosure of a confidential document by preventing use of that document at trial. Indeed, recipients of disclosed materials can be prohibited even from basing questions on them. Thus, courts can insure that the inadvertent disclosure does not affect the outcome of the litigation. It appears, then, that maintenance of the privilege despite disclosure can be a significant benefit to the client. The value of maintaining the attorney-client privilege despite disclosure extends beyond the litigation at hand. The client may become involved in future lawsuits where adversaries seek discovery of arguably privileged materials. If the attorney-client privilege covering specific documents was waived in prior litigation, the client will be unable to assert the privilege with regard to those documents. Thus, maintaining the attorney-client privilege despite disclosure in one lawsuit preserves the privilege for future lawsuits.

Note, 82 Mich. L.Rev. at 608–609 (footnotes omitted).

Although the harm that defendant has suffered due to its inadvertent production of privileged documents cannot entirely be undone, that is not necessarily a reason why the court should refrain from doing what it can. *Telephonics Corp. v. United States,* 32 Fed. Cl. 360, 362 (1994) (rejecting a receiving party's claim that a waiver should be found "since the court has no power to expunge the disclosed information from the minds that now contain it" because "[s]uch a result would give recognition and reward to [the receiving party's] sharp practices at the examination, and [would be] contrary to standards reasonably pertaining to discovery conduct"); *but see Draus v. Healthtrust, Inc.-The Hospital Co.,* 172 F.R.D. 384, 390

(S.D.Ind.1997) (criticizing the consequences of finding that no waiver occurred from the inadvertent production of privileged documents since the parties and the court would know things that the jury would not know, but overlooking the fact that this is what happens whenever the trial court grants a motion *in limine* ).

Of the five factors typically considered, three favor defendant and two favor plaintiff and relator. Among the three factors favoring defendant is the one that the court regards as the most important, namely, fairness. Considering both the five factors and all of the relevant circumstances,[18] the court finds that no waiver of defendant's attorney-client privilege occurred due to defendant's inadvertent production of privileged documents.

### 3. Crime or Fraud Exception

Plaintiff and relator also alleges that the crime or fraud exception to the attorney-client privilege applies to some of the documents withheld by defendant on the ground of privilege. Specifically, plaintiff and relator contend that the documents listed in Exhibit A to the Joint Submission at tabs 15–20 and 22–29 fall within the scope of the crime or fraud exception. [Joint Submission at 69 n. 21]. Plaintiff and relator also contend that the documents listed in defendant's "not produced/not contemporaneously logged" privilege log at tabs 45, 47, 58, 65–67 fall within the scope of the crime-fraud exception. [Joint Submission at 69 n. 21].[19]

■ Despite the importance of the attorney-client privilege, there are some exceptions to it. One of those exceptions is the crime or fraud exception. "The protection afforded by the attorney-client privilege does not extend to any communication 'in furtherance of intended, or present, continuing illegality.'" *In re Grand Jury Proceedings,* 87 F.3d 377, 381 (9th Cir.1996) (internal quotation and citation omitted), *cert. denied,* 519 U.S. 945, 117 S.Ct. 333, 136 L.Ed.2d 246 (1996). The purpose of the crime or fraud exception is "to assure that the 'seal of secrecy' ... between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Zolin,* 491 U.S. at 563, 109 S.Ct. 2619 (quoting *O'Rourke v. Darbishire,* A.C. 581, 604 (D.C.[1920] )).

■ The crime or fraud exception applies if the attorney-client communications "were in furtherance of an intended or present illegality and ... there is some relationship between the communications and the illegality." *United States v. Bauer,* 132 F.3d 504,

---

18. Another flaw in the *Lois Sportswear* test is that it does not consider some of the practical problems that may flow from an inadvertent waiver of the attorney-client privilege. For example, a finding of waiver might deprive a party of counsel of its own choosing, perhaps even the most knowledgeable or skilled counsel who would be most effective in presenting the client's point of view to the fact-finder. That risk exists in this case. If the advice provided by Fried, Frank to defendant, and defendant's interpretation or application of it, are permitted to be used throughout this case, including at trial, it might be necessary for attorneys of Fried, Frank to testify. This might result in the disqualification of individual attorneys or the Fried, Frank firm from continuing to represent defendant in this case. *See* ABA, Annotated Model Rules of Professional Conduct 355–364 (1996) (discussing Model Rule 3.7, which provides that a lawyer generally "shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness"); *see also* Paul W. Vapnek, Mark L. Tuft, Ellen R. Peck & Howard B. Weiner, *California Practice Guide: Professional Responsibility* §§ 8.136–8.166 (2000). Plaintiff and relator have attempted to address

this problem by offering to stipulate that they will not call Fried, Frank attorneys as witnesses, but that may not solve the problem because if plaintiff and relator were able to use the privileged documents at trial, defendant might need testimony from Fried, Frank attorneys to explain those documents or to place them in context. Considering these practical consequences of a waiver makes sense. *Cf. Moody v. Internal Revenue Service,* 654 F.2d 795, 801 (D.C.Cir.1981) ("No court should order disclosure ... in discovery if the disclosure would traumatize the adversary process more than the underlying legal misbehavior.").

19. The court had the opportunity to review the fourteen documents listed in Exhibit A because they were lodged for *in camera* review. The court has not had the opportunity to review the six documents listed on defendant's "not produced/not contemporaneously logged" privilege log because they apparently were not lodged for *in camera* review. Based on the court's review of the documents listed on Exhibit A, *in camera* review of the remaining six documents is neither necessary nor appropriate.

509 (9th Cir.1997) (quoting *United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir.1996), *cert. denied*, 520 U.S. 1167, 117 S.Ct. 1429, 137 L.Ed.2d 538 (1997)); *In re Grand Jury Proceedings*, 87 F.3d at 380. "Showing temporal proximity between the communication and a crime is not enough." *In re Sealed Case*, 107 F.3d 46, 50 (D.C.Cir.1997). Rather, "the government ha[s] to demonstrate that the Company sought the legal advice with the intent to further its illegal conduct." *In re Sealed Case*, 107 F.3d at 50.

"To invoke the crime-fraud exception successfully, the government 'has the burden of making a prima facie showing that the communications were in furtherance of an intended or present illegality ... and that there is some relationship between the communications and the illegality.'" *In re Grand Jury Proceedings*, 87 F.3d at 380 (quoting *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989)). The protection from disclosure created by the attorney-client privilege does not extend to any communication "in furtherance of intended, or present, continuing illegality." *In re Grand Jury Proceedings*, 87 F.3d at 381 (citation omitted).

"The crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of such an improper purpose." *United States v. Hodge & Zweig*, 548 F.2d 1347, 1354 (9th Cir.1977), *abrogated on other grounds*, *In re Grand Jury Subpoenas*, 803 F.2d 493, 496–498 (9th Cir.1986), *corrected*, 817 F.2d 64 (9th Cir.1987); *see also United States v. Friedman*, 445 F.2d 1076, 1086 (9th Cir.1971) (noting that for the crime or fraud exception to apply, "[t]he attorney need not himself be aware of the illegality involved; it is enough that the communication furthered, or was intended by the client to further, that illegality"), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *Chen*, 99 F.3d at 1504 (observing that it is "irrelevant ... that [the lawyers] may have been in the dark") (quoting *In re Grand Jury Proceedings*, 87 F.3d at 381–382). "A communication between client and attorney can be 'in furtherance of' the client's criminal conduct even if the attor-

ney does nothing after the communication to assist the client's commission of a crime, and even though the communication turns out not to help (and perhaps even to hinder) the client's completion of a crime." *In re Grand Jury Proceedings*, 87 F.3d at 382.

The test for application of the crime or fraud exception, then, is less than perfectly clear. As one court has explained, however,

> it isn't enough for the government merely to allege that it has a sneaking suspicion the client was engaging in or intending to engage in a crime or fraud when it consulted the attorney. A threshold that low could discourage many would-be clients from consulting an attorney about entirely legitimate legal dilemmas. Rather, the district court must find "reasonable cause to believe" that the attorney's services were "utilized ... in furtherance of the ongoing unlawful scheme."

*In re Grand Jury Proceedings*, 87 F.3d at 381 (quoting *In re Grand Jury Proceedings*, 867 F.2d 539, 541 (9th Cir.1989)). For this reason, the crime or fraud exception should not be interpreted too broadly. *See Chen*, 99 F.3d at 1499 ("The attorney-client privilege is essential to preservation of liberty against a powerful government. People need lawyers to guide them through thickets of complex government requirements, and, to get useful advice, they have to be able to talk to their lawyers candidly without fear that what they say to their own lawyers will be transmitted to the government.") (citing *Zolin*, 491 U.S. at 562, 109 S.Ct. 2619; *Upjohn*, 449 U.S. at 389, 101 S.Ct. 677); *Chen*, 99 F.3d at 1500 ("This valuable social service of counseling clients and bringing them into compliance with the law cannot be performed effectively if clients are scared to tell their lawyers what they are doing for fear that their lawyers will be turned into government informants.") (citing *Fisher*, 425 U.S. at 403, 96 S.Ct. 1569); *see generally Bauer*, 132 F.3d at 510 ("It is important to note that the attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system.").

The court analyzed the applicability of the crime or fraud exception in two ways.[20] First, the court considered the issue simply on the basis of the papers filed by the parties, but without reviewing the documents which plaintiff and relator contend fall within the crime or fraud exception. Second, after making a tentative determination, the court then carefully examined each of the documents to see if such examination would suggest that the court's tentative determination should be reconsidered.[21] In each instance, the court's conclusion was the same. Although the fourteen documents which plaintiff and relator contend fall within the crime-fraud exception deal with matters relevant to this case which plaintiff and relator contend were the subject of defendant's alleged fraud, and although the documents were created during the time when plaintiff and relator argue that defendant was planning or committing the alleged fraud, plaintiff and relator concede that there is no evidence that defendant's counsel knew of the alleged fraud or provided legal advice for the purpose of furthering the alleged fraud [*see* Joint Submission at 72], and there is no evidence that defendant obtained or used the advice of its counsel to further any alleged fraud.[22]

## Conclusion

For the foregoing reasons, defendant's motion for a protective order is **granted**. Plaintiff and relator are directed to take the following steps within eleven (11) days: (1) return all copies of the inadvertently produced privileged documents to defendant; and (2) destroy the relevant portions of documents or computer files containing summaries of, or quotations from, the inadvertently produced documents. Plaintiff and relator also are directed not to mention, use, or disclose the documents or their contents in any way or for any purpose, except in connection with a motion to reconsider this ruling. *See, e.g., Transportation Equipment Sales Corp. v. BMY Wheeled Vehicles,* 930 F.Supp. 1187, 1188 (N.D.Ohio 1996) (requiring extensive corrective measures by counsel for the receiving party); 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2016.2, at 246 (2d ed. 1994) ("Where waiver is not justified, courts sometimes direct that the inadvertently produced materials be returned and that there be no reference to them for the remainder of the case.").

Any oral or written requests for awards of monetary sanctions are **denied**. No party acted unreasonably in presenting the issues raised by this motion for judicial resolution.

**IT IS SO ORDERED.**

20. The court was neither asked nor required to independently determine whether the documents are privileged during the course of its *in camera* review. The only question was whether the crime or fraud exception to the privilege applied. In any event, it is *obvious* that many of them are privileged.

21. The court took this step even though plaintiff and relator only arguably crossed the threshold for *in camera* review, *see Gomez,* 255 F.3d at 1131 (quoting *de la Jara,* 973 F.2d at 748), because the case is here only for discovery and in order to definitively resolve the dispute.

22. More detailed discussion of the reasons for this aspect of the court's ruling would require describing of the contents of the documents. Since the public might have a right of access to that discussion, including it in this order might destroy the privilege. Therefore, such detailed discussion is omitted.

Of course, the court expresses no view as to whether defendant did or did not commit fraud. The court simply finds that if what defendant did amounted to fraud, plaintiff has not shown that defendant obtained or used the advice of its counsel in an effort to further it.